In the matter of the organization of the Third Division Irrigation District.

T. H. Gies, E. M. Tolman, R. E. Mowrey, Art Rohn, R. O. Allbert, Nels Ballard, Dean E. Judson and Wm. Wall,

*Appellants (Contestants, Objectors and Protestors below)*

vs.

Walter A. Boehm, A. J. Jarnagin, Delbert V. Edwards and Allen D. Talbott, et al.

*Appellees (Petitioners below)*

(No. 2834; September 16th, 1958; 329 Pac. (2d) 807)

For the appellants the cause was submitted upon the brief of Spence and Hill of Riverton, Wyoming, and oral argument by G. L. Spence.

For the appellees the cause was submitted upon the brief and also oral argument of Donald Spiker of Riverton, Wyoming.

Heard before Blume, C. J. and Harnsberger and Parker, JJ.

## OPINION

Mr. Chief Justice BLUME delivered the opinion of the court.

This is a proceeding for the organization of the Third Division Irrigation District composed of areas in the so-called North Pavillion and North Portal, the former being adjacent to part of the Midvale Irrigation District. After hearing the court organized the district, and the appellants herein, eight in number, have appealed from that order of the court. A rough sketch of these areas is as follows:

A petition for the organization of the irrigation district was filed in Fremont County, Wyoming, on May 1, 1957. The petition in substance states as follows: Petitioners are entrymen upon the public lands of the United States or are freeholders to be included within the boundaries of the proposed irrigation district. The district is sought to be organized under the provisions of Ch. 71, Art. 8, W.C.S. 1945 and is to be named the Third Division Irrigation District. The lands included within the proposed irrigation district are irrigable lands which have been reclaimed through the efforts of the United States Bureau of Reclamation. A general description of the lands proposed to be included in the district is the lands within Townships 2, 3 and 4 N., in Ranges 1, 2, 3 and 4 E., Wind River Meridian, in Fremont County, Wyoming. The lands are described in Exhibits B, C and D attached to the petition. Those proposed to be included are unsatisfactory for agricultural purposes except by means of irrigation and drainage. An irrigation system and drainage system have been constructed by the United States Government sufficient to supply irrigation water to the lands and to drain a part thereof. The aforesaid irrigation system and drainage system have been and are being operated by the United States Government and the operation and maintenance thereof have been and are being charged to the entrymen and owners of the lands proposed to be included within the district . Attached to the petition is a copy of the engineering report and a supplement thereto. These reports show that the irrigation system is a feasible project, has a sufficient and adequate water supply, and that the irrigable lands included therein have an area of approximately 8,585 acres. The approximate cost of construction is $6,-984,295. There are approximately 82 water users in the proposed district. The petitioners desire the proposed formation of the district for the object and pur-

pose of having an organization which can arrange for operation and maintenance of the irrigation district and negotiate and enter into contracts with the United States Government for the purpose of repaying the indebtedness to the United States charged to the lands within the district and to provide for the assumption as guarantor or principal of the indebtedness to the United States on account of lands in the irrigation district as required by the Reclamation Project Act of 1939, 53 Stat. 1187, 43 U.S.C.A., Ch. 12, 1485 et seq. (1957 Cum. Ann. Pocket Pt.). The boundaries of the proposed district will include lands mentioned in Exhibits B, C, and D, these exhibits showing the names of the owners of the land or entrymen and the description of each tract separately owned. Petitioners desire and propose to cooperate with the United States Government and to do any and all things necessary and incident to the powers and duties of the irrigation district. The petitioners are either the owners of or entrymen on more than one-half of the total area of lands within the boundaries of the proposed district. The petitioners accordingly ask that the district be organized.

Attached to the petition are engineering reports which will be mentioned later in this opinion, and attached also is a list of owners or entrymen of lands together with the description of the lands, both gross acreage and acreage which is irrigable, and a list of lands still belonging to the United States Government consisting of 805.80 irrigable acres. Attached also are thirteen different sheets of paper headed as follows: "We, the undersigned, certify that we have read or know the contents of the foregoing petition to form the Third Division Irrigation District, and voluntarily have signed said petition". Some 62 signers appear on these sheets of paper. Attached also are affidavits

showing judgment lien holders, mortgagees and non-residents. Other matters will be mentioned later. Nineteen contestants entered their appearance in the proceeding, contesting the organization of the district. Of the reasons set forth by them, only those argued in the briefs of counsel will be mentioned herein.

1. Contestants claim that the petition for the irrigation district is insufficient and does not contain a sufficient number of signers and the genuineness of the signatures of these signers has not been shown. Section 71-801, W.C.S. 1945, provides: "No petition having as many signers as are required by this section shall be declared void". The meaning of this is not clear, but the statute apparently contemplates that the petition together with its exhibits shall be prima facie sufficient to give the court jurisdiction in the premises. It might prove to be dangerous to permit an irrigation district to be organized with the mentioned provision of the statute if that stood alone. Signatures might be forged and it might prove to be difficult for contestants to prove the forgery of these signatures. But that provision does not stand alone. Section 71-803, W.C.S. 1945, provides for notice to be given residents, mortgagees and judgment lien holders. It also provides that the notice shall be published in a newspaper for three weeks. The next section provides for notification of non-residents. It appears in the record herein that the notice has been duly published as required by statute. The record also shows that service of the notice was made upon 65 different land owners or entrymen by the sheriff of Fremont County, Wyoming, and affidavits in the record show that notice was given to judgment lien holders, mortgagees and seventeen nonresidents as required by the statute. These statutory provisions and the compliance therewith would seem to enable all parties interested to fully protect themselves.

Again, § 71-807, W.C.S. 1945, provides:

"The affidavit of any three [3] or more of the signers of said petition stating that they have examined it and are acquainted with the locality of said district and that said petition is signed by a sufficient number of corporations and adult persons owning lands in said district, to satisfy Section 1 [§71-801] of this chapter, may be taken by the court or judge as sufficient evidence of the facts therein stated."

The record herein shows that three of the signers of the petition made an affidavit dated April 30, 1957, and filed May 1, 1957, showing the facts mentioned in the foregoing section of the statute. There is further attached to the petition filed May 1, 1957, a further affidavit signed by four different signers of the irrigation district and showing:

"* * * that the adult persons and corporations who have signed the said Petition or Petitions are the entrymen upon or the owners of over one-third of the area of lands proposed to be included within the boundaries of said Irrigation District; and we particularly find that 53 entrymen and owners have signed the said Petition or Petitions; that said signers are the entrymen and owners of 17,132.98 gross acres and 7,985.10 irrigable acres in area of the lands proposed to be included within said Irrigation District.

"We further find that there are a total of 82 entrymen and owners of the lands proposed to be included within the said proposed Irrigation District * * *."

Eleven persons filed their withdrawal from the petition, but of these eleven, four canceled their withdrawal and ratified the original petition. Subtracting these seven from the 53 above mentioned (the court found that there were 54) would leave 46 signers of the petition, sufficient to comply with the requirement of the statute. The contestants, however, claim that

a number of these signers previously signed a petition to join the Midvale Irrigation District as provided by § 71-814, subparagraph 2, W.C.S. 1945. These parties, however, and their acreage in the North Pavillion area had not been taken into the Midvale Irrigation District at the time of the organization of this district, and the trial court refused to subtract these signers from the number of signers of the petition. We think that the action of the trial court was correct. We might mention in this connection that so far as we are able to tell, the 19 contestants, excepting C. L. Blair who later ratified the proceedings herein, represent an irrigable area of 1,441.4 acres; that the persons who withdrew but did not subsequently ratify the proceedings represented an irrigable area of 606.7 acres. The area in North Pavillion represented by the appellants herein is 488.3 irrigable acres. We think the objection of contestants as to the sufficiency of the petition, the number of signers and the notice should be overruled.

2. Section 71-801 states:

"* * * Accompanying said petition shall be a preliminary engineering report on the feasibility of the project, including a report on the sufficiency of its water supply; the approximate area of irrigable land within the district, including an estimate of the cost of construction; all of which shall be approved by the state engineer;"

The report shows a detailed statement as to the irrigation works, the approximate area of the irrigable land within the district and an estimate of the cost of construction and the sufficiency of water supply. The report purports to be signed by B. L. Mendenhall, Project Manager of the Riverton Project, Bureau of Reclamation. It is claimed that these reports should have been signed by an engineer licensed under the laws of the State of Wyoming. The statute does not make that requirement, nor does it require verifica-

tion of the signature. The testimony shows that B. L. Mendenhall is an engineer. The statute further requires that the engineering report should be approved by the State Engineer. It purports to be signed by L. C. Bishop, State Engineer. It is claimed that his signature has not been identified or proven. The testimony in the record shows that the report was sent to the State Engineer and was returned signed by what purported to be the State Engineer. L. C. Bishop was the State Engineer for many years. He signed many public documents, including a number of documents which from time to time have come to the attention of this court, so that if the testimony above mentioned is not sufficient we think we should take judicial notice of the signature. It would be an idle process to reverse this case merely to have a more specific identification of the signature of Mr. Bishop. We think that the objection of contestants as to the engineering reports should be overruled. The reports do not use the terms "feasible" or "feasibility" but whatever imperfections appear in the reports are not, in view of the evidence herein, of such a nature as to require reversal of the judgment herein.

3. Contestants also claim that the boundary has not been sufficiently stated. The court, in establishing the district, gave a specific description of the lands which were to be contained in the district and provided, "the boundaries of said District shall be the exterior boundaries for lands described in 'Exhibit A' ". Such exhibit was attached. Section 71-803 provides that the notice shall state, among others, "the proposed boundaries of said district (or a general description of all the lands in said proposed district)." It would seem that in view of this statute no question can be raised in connection with the boundaries of the district. The court directed that all of the lands described in the pe-

tition and exhibits attached thereto and in the advertised notice should be included in the district.

Counsel for appellants say that "the only legal description before this Court, in evidence, are the tract plats, Plaintiffs' Exhibit 3, the same being 36 plats in all." And they say that these plats were erroneously permitted to be introduced in evidence. We do not understand what counsel mean. The exhibits and the notice describe the land according to Government surveys. We fail to see why that is not sufficient, without reference to these plats. Each one of these plats seemingly is a survey of a section or a tract of land embraced in the irrigation district sought to be organized and illustrates the situation of the various tracts or sections. They purport to be made by the Department of the Interior and are certified as such. They were probably properly introduced in evidence (20 Am.Jur. Evidence § 58, p. 81) but, if not, the introduction thereof was without prejudice.

4. Contestants claim that there was no compliance with the provisions of § 71-802, W.C.S. 1945, in that no evidence whatever was introduced that the work of each part would exceed the damages from the costs of the proposed work and no evidence showing that the proposed work could be done more cheaply in a single district than otherwise. The section cited states as follows:

"The lands *proposed* to be included in any irrigation district, need not be contiguous provided that the benefit of the *proposed* work in each part will exceed the damages from costs of said *proposed* work in each part; and provided further that the court shall be satisfied that said *proposed* work can be more cheaply done if in a single district than otherwise; and provided further that lands within a town or city may be included within the limits of any irrigation district, if the creation

of such irrigation district will benefit such town or city in any amount equal to or in excess of the amount of assessment for construction against the lands therein." (Emphasis supplied)

It may be noticed that the statute refers only to the *proposed* work. The work in the case at bar had been completed or substantially completed so that it is doubtful that that section of the statute has any particular bearing in this case.

If, however, this is too narrow a construction, let us examine the provision a little more closely. It states that "provided that the benefit of the proposed work in each part will exceed the damages from costs of said proposed work in each part". The word "damages" is hardly apropos. The provision means merely that each part must be benefited by the proposed work and that the benefit must exceed the cost. The testimony of the witness Rawlings, hereafter quoted, indicates that to be true (Q. 1547). The exact amount of benefit must be determined by the contract entered into with the United States Government and cannot very well be determined until the district is organized.

The second provision states: "provided further that the court shall be satisfied that said proposed work can be more cheaply done if in a single district than otherwise." The trial court must, when it entered its judgment, have been satisfied in connection with this provision. The North Pavillion and North Portal are part of what is called the Third Division, a part of which is designated on the attached map for future development. And the whole area seems to be intended to be in the future what we may call a combined unit. The testimony shows that the Third Division works were constructed to serve water to both North Pavillion and North Portal "as if they were one area, and the problem of operation and maintenance would arise

if those areas were divided and made into two entities" (Q. 952). This would seem to indicate, at least to the Bureau of Reclamation, that the irrigation works could "be more cheaply done if in a single district than otherwise." Furthermore, the two units have been operated for many years by the Government as one. The testimony further shows that it is deemed inadvisable and impractical to separate the two units (Q. 951). Those facts were, we think, sufficient to justify the court in finding that the statutory requirement above mentioned was satisfied.

5. *Feasibility.* It is not questioned by counsel for the appellants that the project is physically feasible. There is an ample supply of water and the area composed of North Pavillion and North Portal has been operated as a separate entity by the United States Government for a number of years and the water users have so far paid only the operating expenses. So that the only question in this case is as to whether the project is feasible economically. The area of North Pavillion was opened up for settlement in 1949 and the area in North Portal in 1950. In each case notice was given providing in substance:

"* * * The Reclamation Law provides that except during a 'development period' fixed by the Secretary of the Interior, water may not be delivered for the irrigation of lands until an organization, satisfactory in form and powers to the Secretary, has entered into a contract with the United States providing for the repayment of the project construction costs which are allocated to such irrigated lands. * * * The development period for the lands so designated is fixed at a period of ten (10) years from and including the first year in which water is delivered. Before the end of this development period, all lands above described * * * must be included within an organization of the type described and such organization must execute a contract covering the repayment of the construction costs

allocated to such lands. * * *" Bureau of Reclamation, Riverton Irrigation Project, Wyoming, Public Notice No. 28, § 24(b), April 4, 1949.

The notice further stated that at that time the complete cost was not known. However, the evidence in this case shows that at the time of the hearing in the proceeding herein the known costs as well as estimated costs amounted to $6,984,295 (QQ. 894, 1044).

We shall not attempt to answer every single point which has been raised by counsel for the appellants in this case. We might first mention some minor ones, for instance, that the court erred in permitting rebuttal testimony to be introduced in order to show the feasibility of the project. That matter, of course, was in the discretion of the court and is no ground for a reversal of the judgment herein. Counsel further mention, for instance, that B. L. Mendenhall, Project Manager of the Bureau of Reclamation for the Riverton Project, signed the engineering report and based his statement of the cost of the project connected with North Portal and North Pavillion upon amounts furnished him by the Denver Division of the Bureau of Reclamation. It can hardly be expected in a large bureau like that of the Reclamation that every officer thereof would know the various items that went into the construction of the project. We think we may reasonably assume that some systematic regularity of accounting is followed in the various divisions of the Bureau and that the amounts furnished to Mr. Mendenhall were substantially correct. We think that the objection here made is not well taken.

It is contended by counsel for appellants that it would be more feasible if lands in North Pavillion and North Portal were included in the Midvale Irrigation District because it would be unnecessary to duplicate machinery, tools and instruments in connection with

the operation of the district. There is some testimony in the record that the Midvale Irrigation District could operate the irrigation works in North Portal and North Pavillion more economically than the district itself. There is also evidence to the contrary. On September 20, 1948, there was filed in the matter of the Midvale Irrigation District a supplemental report alleging that it would be for the best interest of the Midvale Irrigation District if lands in North Pavillion were excluded. After notice and hearing in this matter, the court on October 13, 1948, approved the report, holding that it would be for the best interest of Midvale if the lands in North Pavillion were excluded. There is no showing in the record before us that the situation has changed or at least has changed to any great extent. The costs of joint operation might be more cheap in the beginning but whether it would be in the long run or not is a different proposition. North Pavillion and North Portal are a separate entity and have been so considered for many years. It has its own lateral system of irrigation. The lateral system in the Midvale Irrigation District cannot be used in connection with North Pavillion and North Portal. The witness Jarnagin has lands in the North Pavillion and when he was asked as to why he wanted to organize a separate irrigation district he answered in part as follows:

"[Q. 1173] Well, I figure as a group we are much more able to handle our own problems than we are able to turn it over to some other irrigation district to handle part of it, because they don't know our immediate problems like we know it ourselves, and we stand a much better chance of coping with our problems ourselves than we do letting some of our neighbors over some 15 or 20 miles from there settle it for us."

"[Q. 1175] * * * We pay them their O&M price that it cost them to keep up their old ditches, where we have

got new ditches that have been in operation now about seven years, and their ditches are 30 years old, some of them. We would have to pay to keep their ditches up and rebuild them and replace structures, when ours has just been built, and I can't see that we should join some other irrigation district and keep up their district and pay their costs when we have got our's already built."

We think that the question of whether or not North Pavillion and North Portal should be joined to the Midvale Irrigation District is a question of advisability and not one of legality.

We might say in that connection that counsel for appellants seem to be of the opinion that the project for irrigating the North Pavillion and the North Portal would be feasible if it were to be joined to the Midvale Irrigation District, but not feasible if not so joined. But the productivity of the land would be the same in either case; the burden that North Pavillion and North Portal would have to bear would be the same, or perhaps a little more or a little less, depending on what kind of contract for repayment could be negotiated. We are unable to follow the logic of counsel.

The appellants, in order to show the nonfeasibility of the project, called as a witness former Governor Leslie A. Miller who testified at great length as to the reckless expenditures of money by the Bureau which were entirely unnecessary. Counsel also introduced in evidence Contestants' Exhibit D, 2 Report on Water Resources and Power, June 1955, containing at pp. 699-713 a report as to the feasibility of the Riverton Project, which, aside from the Midvale Irrigation District, embraced some 45,000 acres originally. Appellants cite us to statements contained in that report, some of which are as follows, pp. 704-707:

"The Bureau has permitted many of the project lands to be settled and has thereby represented the lands as being suitable for producing income which would pay all farm development and operation costs, furnish an adequate standard of living for the farm family, and pay project operation and construction charges. It has been demonstrated, however, that much of the land is not suitable for irrigation. * * *

"The water users do not know the true character of many project lands * * *. * * * it appears that the technicians have been persuaded to place questionable land in an irrigable class to obtain the greatest possible project acreage and thus obtain lower per acre cost. * * *

"* * * of utmost concern is the social problem of the settlers whom we have permitted to settle on lands of unsatisfactory quality. The sufficiency of many of the farm units in the North Pavillion area and most of the units in the North Portal area is seriously questioned. * * *

*       *       *       *       *

"It is doubtful if the recognized principles of feasibility can any longer be applied to the required improvements and maintenance of canal lining and drainage because the costs probably in most instances are beyond the ability of the lands to repay. * * *

*       *       *       *       *

"* * * it is important that project conditions be clearly stated to the water users. To date this has not been done and they have received continual promises of relief in the form of canal lining and drainage when it is not known whether either of these would be successful or whether economic justification existed for the expenditures required.

*       *       *       *       *

"* * * The economic feasibility of investigations and construction required to stabilize production of the lands is questionable * * *."

The report also contains the following at p. 713:
"Conclusions regarding the ultimate fate of the Riverton project are difficult, if not impossible. Drainage deficiencies have a way of showing up in most unexpected places, and to completely unanticipated extent. An example is on the North Portal unit of Riverton of several thousand acres. In 1954 the extent of damage was quite appreciable; the estimates of farmers were that, while within a few years probably as much as half the acreage of the unit would be out of production by reason of the drainage difficulties—just where the damage would eventuate could not be pinpointed.

*     *     *     *     *

"Great anxiety can rightfully be expressed as to the loss of capital investment at Riverton, but far more worthy of concern—the plight of a family who have invested their life savings to make a permanent home on land which subsequently goes sour and the family loses several years of usefulness in life's processes."

We agree, of course, that homesteaders expecting to use the facilities for irrigation furnished by the Bureau of Reclamation should be informed as fully as possible of the facts facing them, including the expected cost of the facilities, although it seems that unexpected necessity of drainage and some other factors make it impossible to furnish the exact cost. It may be conceded, in view of the foregoing report, that the prospects for the project in question are not as bright as could be wished, and we regret the way the Bureau of Reclamation inflates the cost of this and other irrigation projects in the manner testified to by former Governor Miller of this State, who was Chairman of the Task Force on Natural Resources of the first Hoover Commission, when he pointed out that the projects employed "more supervision, more engineers, more people than the work justifies, more than the program justifies"; and further stated that "We found in the Riverton project [of which the instant project is a

part] as a result of our inquiries that the expenditures by the Bureau of Reclamation which would afterward have to be borne by the farmers were, in our judgment, excessive to a very, very great degree, and we so reported to our task force." However, this court is without power to curtail such profligate practices. Counsel for appellants contend that the report furnishes irrefutable proof that the prospect is hopeless. However, after the report was made, the homesteaders of North Portal and North Pavillion were authorized by an act of Congress to change, rearrange or relocate the areas on which they had filed. 67 Stat. 566, 43 U.S.C.A. § 451, (1957 Cum. Ann. Pocket Pt.). Only irrigable, not gross, acres are assessable for cost of construction of the facilities, so that in view of the foregoing report re-examination of the irrigable acreage was necessary. It was found that the classification of lands from the standpoint of irrigation was faulty. Some of the land was not in fact irrigable. It was found necessary to reclassify the lands, eliminate non-irrigable land, reduce the irrigable acreage and permit, as we understand it, part of the cost to be rendered nonreimbursable. The irrigable acreage embraced in North Pavillion and North Portal was originally 13,000 or 14,000 acres, but by reclassification that acreage was reduced to some 8500 to 8800 acres. It further seems that some drainage work has been done since the time of the foregoing report, although not all. Hence, the situation mentioned in the report is not what it was at the time it was made. The settlers on these areas are in a better situation than they were at the time of the report, and there is at least no direct evidence in this case that with the irrigable area reduced and modified as here mentioned the project is not feasible. In any event, hopeless as counsel may deem the project to be, the water users in these areas, lest water for irrigation would be withheld, want to

have the opportunity of entering into a contract with the Federal Government in order to determine the amount of their liability for repayment of the construction costs although, as shown by the position of contestants herein, some of them desire to go into the Midvale Irrigation District while the majority do not. This court is hardly justified in destroying whatever hope the water users may have, little though it may be. Besides if we may credit the testimony of the witness Rawlings, as hereafter related, the project is not as hopeless as counsel for appellants seem to think.

The crux of the argument of counsel for appellants is as follows: Though § 71-801 provides that an irrigation district may be organized for the purpose of entering into a contract with the Government to repay the costs of construction, such provision is meaningless until it is first shown that the irrigation district in this case is economically feasible. Counsel point out that the estimated cost of construction is $6,984,295 to which other costs will probably be added, especially on account of drainage, so that the cost of construction will be at least $813 per acre, compelling the water users to pay more than twenty dollars an acre per year; and counsel claim that we should take judicial notice of the fact that the agricultural land in this state is not worth that; that possibilities cannot be considered; that the fact that a reduction may be made by a contract or that the Secretary of the Interior or Congress may ratify such contract are matters purely speculative and cannot be considered by the court, and it must be shown at this time that the water users are able to pay the construction cost within a period of 40 years as now provided by the Act of Congress. 53 Stat. 1195, 43 U.S.C.A. § 485h(d) (2) and (3), (1957 Cum. Ann. Pocket Pt.). If the criterion here mentioned by counsel for the appellants is the ultimate criterion, then it is doubtful that any more irrigation districts will be

organized in this state which are to be organized under the Federal Reclamation Acts, and the court never should have permitted the organization of the Midvale Irrigation District since its situation, while not exactly the same, was very similar to that existing in the area now attempted to be organized into an irrigation district.

Counsel for appellants cite us to, and rely greatly on, the case of Padlock Ranch, Inc. v. Washakie Needles Irrigation Dist., 50 Wyo. 253, 60 P.2d 819, 61 P.2d 410, and the same case, In re Washakie Needles Irrigation Dist., 52 Wyo. 518, 76 P.2d 617, in which it was held that the feasibility of a project must be determined by the court before and not after the district is organized and that one of the important facts to determine is the cost of the project. So counsel argue that the exact cost must be determined by the court before ordering the organization of the district and that that has not been done in the proceeding before us. We might mention the fact that such strict requirement is not even required in the foregoing cases, these cases recognizing that some changes in the cost are apt to be made in every irrigation district. The foregoing cases are distinguishable from the case at bar. They involved the organization of an irrigation district (the project of which had not been constructed) by private enterprise except that the Federal Government offered to contribute $200,000. That offer was ultimately withdrawn because the project was not feasible and, as we understand it, because of the physical nonfeasibility. In re Washakie Needles Irrigation Dist., supra. It was of course important to determine the cost of construction in such a case, mainly in order to determine whether or not the project was physically feasible. Economic feasibility was not even mentioned in the cases except only insofar as it might be implied from the cost of

construction. In the case at bar the project has already been constructed. Costs, insofar as are known, have been determined. Entirely different questions arise in this case, the main one of which is as to how much of the cost of construction is to be repaid to the Federal Government.

Section 71-801 states, as shown above, that the engineering report should show the feasibility of the project. It is not specifically stated that the report must show the economic feasibility and probably in the main refers to physical feasibility. In any event, that provision does not stand alone. Other provisions must be construed in pari materia. The section also provides that an irrigation district may be organized for the purpose of the assumption as principal or guarantor of an indebtedness to the United States. The Third Division Irrigation District is intended to be organized for that specific purpose. Section 71-813, W.C.S. 1945, provides that the commissioners of the district may negotiate a contract "for the assumption, as principal or guarantor of the indebtedness to the United States on account of district lands", and the section further provides that the contract must be approved by the water users. Some effect must be given to these provisions. As mentioned before, counsel for appellants do not give them any. They contend substantially that the economic feasibility must be shown without reference thereto, that is to say before the district is organized and, hence, before a contract is negotiated. There might be some force to the contention if the contract could in no way and under no circumstances diminish the obligation of the district in the amount of $6,984,295 and additional costs payable in 40 years. But the evidence in this case does not show that to be true. A contract is not under our statute an idle ceremony. It must be approved by the

commissioners and by the water users. It is intended for the direct purpose to lighten the economic burden of the water users as much as possible and to determine, at least in part, as to whether or not the project is feasible from an economic standpoint. It follows of course logically that to enable that to be done the district must first be organized.

Counsel for appellants lay altogether too much stress on the cost of $813 per acre. In the first place, they forget the fact that the cost of production (finally allocated) is to be repaid without interest. Counsel for appellees figures that if the water users were given 100 years in which to pay, the cost per acre would be reduced to $133 per acre. We do not stop to find out whether that fact is correct. But the principle involved is important and has a substantial effect on what the water users must ultimately repay for the cost of construction.

William E. Rawlings is the Regional Supervisor of Irrigation for the Bureau of Reclamation and is the party with whom the contract for repayment would have to be negotiated. He testified that the Bureau of Reclamation in making a contract with water users for repayment of construction costs considers three factors: First, the cost of operation; Second, a reasonable living for the farmer and his family; Third, repayment is to be made from what is left over. He further stated that the Bureau makes corrections from time to time as necessity requires and then proceeded to state:

"[Q. 1547] * * * we have made enough of those trial runs to be pretty well assured that there is enough margin in this area to take care of the cost of production under irrigation, the family living items, and the cost of water, so that we are confident that we can work out a satisfactory payment arrangement to take

care of whatever obligation is established for the land."
That should be at least some evidence of the economic
feasibility of the project here in question.

The cost will be allocated by the Secretary of the
Interior. 53 Stat. 1193 as amended July 26, 1947, c.
343, title II, § 205(a), 61 Stat. 501, 43 U.S.C.A. § 485h
(1957 Cum. Ann. Pocket Pt.). It will not all be allocat-
ed to irrigation. According to the witness Rawlings,
part of it will not be reimbursable by reason of the re-
duction of irrigable land in the district from 13,000 to
about 8800 acres and probably in that proportion. The
Secretary of the Interior may allocate part of the cost
for power purposes, part to wildlife preservation, part
to recreation and perhaps to other purposes. Ivanhoe
Irrigation Dist. v. McCracken, 357 U.S. 275, 78 S.Ct.
1174, 1179, 1180, 2 L.Ed. 2nd 1313. Counsel for ap-
pellants would have us believe as indicated before that
all these and other matters of possibilities and proba-
bilities should be determined before the district is di-
rected to be organized, but it is clear that the time dur-

ing the negotiations is the better time. The Federal
Government has the right to impose reasonable con-
ditions on the use of Federal works. Ivanhoe Irriga-
tion Dist. v. McCracken, supra, at 78 S.Ct. 1183. We
cannot assume that the conditions imposed will be un-
reasonable. To do so would be neither beneficial to
the water users nor to the Federal Government. Ac-
cording to the witness Rawlings it will probably be
necessary to have the contract approved by Congress
and, as before stated, counsel for appellants say that
this matter is too speculative and cannot be considered
by the court in determining whether or not the district
should be organized. In Ivanhoe Irrigation Dist. v.
McCracken, supra, the Supreme Court of the United
States stated as follows at 78 S.Ct. 1188:

"Any suggestion that the Congress might be arbitrary in the final accounting, or trample upon any of the rights of appellees, is highly improbable. It does not seem untoward for the recipients of a huge federal bounty to have to depend in small measure on the continued beneficence of their donor. It would be a physical impossibility to withdraw the facilities. As for the possibility of discrimination in the administration of those facilities, it seems far-fetched to foresee the Federal Government 'turning its back upon a people who had been benefited by it' and allowing their lands to revert to desert. The prospect is too improbable to figure in our decision."

Hence, while theoretically the matter of approval by Congress may be said to be speculative, yet as a practical matter we are dealing with probability. The experience of the Midvale Irrigation District should teach us that.

The judgment of the trial court should be and is affirmed.

Affirmed.