John DAVIS; Wayne Barnett; Fred Barnett; Clair Cheatham and Vida Cheatham, Appellants (Plaintiffs),

v.

CONSOLIDATED OIL & GAS, INC., a Colorado Corporation, successor in interest to Vanderbilt Resources Corporation, a Texas Corporation and Vanderbilt Energy Corporátion, a Texas Corporation; Adobe Resources Corporation, a Delaware Corporation; The Grayrock Corporation, a Texas Corporation, Appellees (Defendants).

No. 89–63.

Supreme Court of Wyoming.

Dec. 4, 1990.

Rehearing Denied Jan. 11, 1991.

P. Richard Meyer and Robert N. Williams of Meyer & Williams, Jackson, and Henry C. Phibbs II of Phibbs & Resor, Jackson, for appellants.

James R. Miller and Kurt C. Weiss of Baker & Hostetler, Denver, Colo., for appellee Consolidated Oil and Gas, Inc.

Cameron Walker, of Schwartz, Bon, McCrary & Walker, Casper, for appellees Adobe Resources Corp., Grayrock Corp., Vanderbilt Resources Corp. and Vanderbilt Energy Corp.

Before URBIGKIT, C.J., THOMAS, CARDINE and GOLDEN, JJ., and ROONEY, J., Retired.

ROONEY, Justice, Retired.

Appellants are engaged in ranching and farming operations about seven miles east of Greybull. Appellees[1] were involved in drilling, plugging and abandoning of an oil and gas well located about one mile from appellants' properties. The well was drilled over 2,900 feet into the Madison Formation where it encountered pressurized water. Contending that failure to properly plug and abandon the well resulted in salty seepage water damaging their lands, appellants filed this action with claims of negligence, trespass and nuisance, fraud, intentional infliction of emotional distress, loss of enjoyment of life and punitive damages.

Appellees were granted a directed verdict on all claims except those for negligence and trespass. The claims for negligence and trespass were submitted to the jury on special verdict interrogatories.

Appellants word the issues on appeal as follows:

"Issue I

"Whether the trial court erred in submitting the special verdict form, Interrogatory Number 1 to the jury over the objection of the appellants.

"Issue II

"Whether the trial court erred in excluding appellants' evidence, made known to it by an offer of proof, which was proper rebuttal evidence.

"Issue III

"Whether the trial court erred by reversing itself and permitting the appellee to list four additional expert witnesses on the eve of the trial 3 of whom testified at the trial.

"Issue IV

"Whether the trial court erred in granting appellee-defendants a directed verdict on appellants-plaintiffs' cause of action for the intentional infliction of emotional distress.

"Issue V

"Whether the trial court erred in granting appellee-defendants a directed verdict on appellants-plaintiffs' cause of action for fraud."

Finding no error, we affirm as to all parties except appellee Consolidated Oil & Gas, Inc., action as to it being for the bankruptcy court and not for this court.

## ISSUE I—SPECIAL VERDICT INTERROGATORY

The jury was instructed that it need not consider additional interrogatories if the answer to the first interrogatory was in the negative. The jury answered the first interrogatory in the negative, resulting in a judgment for appellees. Appellants here object to the wording of the first interrogatory. It read:

1. Appellee Consolidated Oil & Gas, Inc. was a defendant in this matter during the proceedings in the district court, and it was made an appellee in this appeal which was filed February 17, 1989. On March 7, 1989, it filed a voluntary petition in bankruptcy, thus staying this appeal insofar as it is concerned. Accordingly, that said and decided herein has no pertinency insofar as appellee Consolidated Oil & Gas, Inc. is concerned.

"Have plaintiffs proven by a preponderance of the evidence that ineffective plugging and abandonment of the Herren Gulch # 2 well caused Madison water to flow on to any of their ranches?"

Appellants' contention for error in this respect fails for either of two reasons: First, if there was error, it was not preserved with a proper objection, and second, there was no error in the wording of the interrogatory.

 In forming this issue, appellants contend that the trial court erred in submitting the interrogatory to the jury "over the objection of the appellants." The instructions and the verdict form were considered at length by the court and counsel at conference. Numerous objections were made by the parties to various potential instructions, but there was no objection to this interrogatory, nor was there an objection to it at any time before the jury retired to consider its verdict as required by W.R.C.P. 51, which reads in pertinent part:

"Before the argument of the case to the jury is begun, the court shall give to the jury such instructions on the law as may be necessary and same shall be in writing, numbered and signed by the judge, and shall be taken by the jury when it retires. *No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection.*" (Emphasis added.)

The purpose of the rule is to inform the court of the nature and specific grounds of contended error in the instruction or verdict form so that the judge may reconsider the same and correct or modify it, if necessary, to avoid error. *Oeland v. Neuman Transit Co.*, 367 P.2d 967 (Wyo.1962); *Edwards v. Harris*, 397 P.2d 87 (Wyo.1964); *Bentley v. State*, 502 P.2d 203 (Wyo.1972); *Texas Gulf Sulphur Co. v. Robles*, 511 P.2d 963 (Wyo.1973); *Reeder v. State*, 515 P.2d 969 (Wyo.1973); *Runnion v. Kitts*, 531 P.2d 1307 (Wyo.1975); *Haley v. Dreesen*, 532 P.2d 399 (Wyo.1975); *Goggins v. Harwood*, 704 P.2d 1282 (Wyo.1985).

Appellants argue that an objection was unnecessary to preserve error under the provisions of W.R.C.P. 61 relative to harmless error. W.R.C.P. 61 states:

"No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

 W.R.C.P. 61 cannot be interpreted to nullify the *specific* requirements and provisions of other rules of civil procedure, including the provision of W.R.C.P. 51 requiring the necessity for an objection to the failure to give or to the giving of an instruction, and including the provisions of W.R.C.P. 49(a) requiring a demand to include submission of a desired issue of fact in a special verdict to prevent waiver of its consideration by the jury. W.R.C.P. 49(a) reads:

"*Special verdicts.* The court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. *If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by*

*jury of the issue so omitted unless before the jury retires he demands its submission to the jury.* As to an issue omitted without such demand the court may make a finding; or, if it fails to do so, it shall be deemed to have made a finding in accord with the judgment on the special verdict." (Emphasis added.)

If W.R.C.P. 61 were interpreted as argued by appellants, an attorney would never object to the giving of the other party's requested instructions or to the failure to give his own requested instructions, thereby "sandbagging" the court and establishing a basis for appeal in the event of a verdict for the other party. Such interpretation would have the effect of inviting error. W.R.C.P. 51 must be taken to mean what it says. A failure to make a timely objection to the giving, or to the refusing to give, an instruction "stating distinctly the matter to which he objects and the grounds of his objection" is a waiver of any error thereon.

"The matter of waiver is grounded, among other things, on the proposition that jury trials are time-consuming and costly proceedings and while a litigant is entitled to a fair trial, certain it is that he has responsibilities to assist the trial court in bringing about such a result. It will not do to permit a litigant to remain mute and speculate on the outcome of a jury trial on the record made with knowledge of irregularities or improprieties therein that might readily and easily have been corrected during the trial and then, when misfortune comes his way, to attempt to set the invited result aside by way of a new trial because of such matters. It is not fitting for the trial court or this court knowingly to reward or condone such conduct."

*Dewitty v. Decker*, 383 P.2d 734, 736 (Wyo. 1963).

Second, there was no error in the wording of the interrogatory as contended by appellants. They argue that the use of the words "on to" therein prevented the jury from considering damage caused to their lands by the raising of the water table *under* their lands due to seepage water from the well. They argue further that the use of the word "Madison" in the interrogatory prevented the jury from considering damage caused to their lands by water from other than the Madison formation but which was included in, or activated by, seepage from the well.

With reference to the words "on to" in this instance, the meaning is not restricted to water moving on the surface of the ranch lands as argued by appellants. Appellants' ownership of the lands extends under the surface to the center of the earth. Such was recognized during the trial through appellants' evidence that most, if not all, of the damage from salty water or excess water was to appellants' subsurface lands, i.e., to the roots of the vegetation growing on the lands. The thrust of the evidence presented to the jury concerned damage from subsurface water. The jury was not misled by the interrogatory. The trial took six weeks. The testimony was primarily from opinions of expert witnesses. On the one side, the opinions included, for example, (1) that the pressurized water from the Madison formation was improperly blocked in the well allowing the water to enter other porous formations and migrate underground to appellants' lands and causing the water table to rise and prevent normal drainage; and (2) that improperly blocked water migrated underground to appellants' lands by virtue of a fault causing the rise in the water table. On the other side, the opinions included, for example, (1) that the salt and excess water migrating underground to appellants' lands came from leakage of the Porter Canal; (2) that it resulted from the Muddy Shell Creek aquifer discharge; (3) that it resulted because of a retention dam for open pit bentonite mines lying north of appellants' lands; and (4) that the water table was changing pursuant to a ten-year precipitation cycle. The negative answer to the interrogatory was the jury's determination that the *subsurface* water causing damage to appellants' lands was not caused by the plugging and abandoning of the well.

■ With reference to the use of the word "Madison" in the interrogatory, the jury was likewise not misled. The testimony related to whether or not water from the *Madison* formation caused the damage to the appellants' lands. The contention that the well was improperly plugged was with reference to plugging of the *Madison* formation. Some of the experts testified to tests made by them to determine if the damage-causing water was from the *Madison* formation. Water from the *Madison* formation as the cause of damage was the central issue. Appellants argue that the reference in the interrogatory to Madison water precluded the jury from determining that Madison water from the well migrated to their lands and caused a rise in the water table with the damage being a result of the presence of water table water other than Madison water. The argument disregards the common sense of the jury. If Madison water actually migrated into other water in the water table, it would not retain its separate substance. The fluid nature of both waters would cause them to mix and combine. Accordingly, if the jury believed any of the Madison water had migrated into the raised ground water, it would have answered the interrogatory in the affirmative.

There was no error in the wording of the interrogatory. It addressed the fact which was basic to the premise upon which appellants founded their case.

### ISSUE II—EXCLUSION OF REBUTTAL EVIDENCE

■ Appellants contend that the district court erred in refusing to admit evidence in rebuttal consisting of a video tape and ten still photographs depicting seeps in the vicinity of the well. Appellants argue that the exhibits rebutted the testimony of appellees' witness Huntoon to the effect that the area was drying pursuant to a ten-year cycle. The trial court allowed testimony concerning the seeps but refused admission of the exhibits. Such was within the court's discretion.

"A court does not abuse its discretion unless it acts in a manner which exceeds the bounds of reason under the circumstances. In determining whether there has been an abuse of discretion, the ultimate issue is whether or not the court could reasonably conclude as it did. An abuse of discretion has been said to mean an error of law committed by the court under the circumstances. *Eager v. Derowitsch,* 68 Wyo. 251, 232 P.2d 713 (1951); *Anderson v. Englehart,* 18 Wyo. 409, 108 P. 977 (1910); *DiPalma v. Wiesen,* 163 Conn. 293, 303 A.2d 709 (1972); *In re Estate of Horman,* 265 Cal.App.2d 796, 71 Cal.Rptr. 780 (1968)."

*Martinez v. State,* 611 P.2d 831, 838 (Wyo. 1980).

"Judicial discretion is a composite of many things, among which are conclusions drawn from objective criteria; it means a sound judgment exercised with regard to what is right under the circumstances and without doing so arbitrarily or capriciously. *Byerly v. Madsen,* 41 Wash.App. 495, 704 P.2d 1236 (1985)."

*Martin v. State,* 720 P.2d 894, 897 (Wyo. 1986).

■ W.S. 1–11–205(a)(iv) provides that after a defendant has presented his evidence "the parties will then be confined to rebutting evidence unless the court permits them to offer evidence in their original case." The general rule here applicable is stated in 75 Am.Jur.2d, *Trials* §§ 150 and 151 (1962):

"§ 150. Rebuttal.

"One cannot, except in the discretion of the trial court, introduce as a part of his rebuttal testimony relative to new and independent facts competent as a part of his testimony in chief. What is rebuttal evidence rests largely within the discretion of the trial court. * * *

\* \* \* \* \* \*

"The general principle that in order to warrant a reversal the error must have been prejudicial to some substantial right of the appellant or plaintiff in error applies to rulings of the trial court on matters relating to examination on rebuttal.

"§ 151.—Evidence in chief on rebuttal.

"As a general rule, the party upon whom the affirmative of an issue devolves is bound to give all his evidence in support of the issue in the first instance, and will not be permitted to hold back part of his evidence confirmatory of his case and then offer it on rebuttal. Rebuttal testimony offered by the plaintiff should rebut the testimony brought out by the defendant and should consist of nothing which could have been offered in chief. And unless the court in its discretion dispenses with the requirement, the defendant, as well as the plaintiff, should introduce all his evidence in chief in support of his main case. But the trial court may, in its discretion, permit the introduction of such evidence on rebuttal, and an appellate court will not interfere except in cases of clear abuse of discretion. Nor, as a general rule, will the court on appeal interfere with the discretion of the trial court in refusing to permit evidence in chief to be introduced in rebuttal. However, where evidence is real rebuttal evidence, the fact that it could have been offered in chief does not preclude its admission in rebuttal."

The court has discretion in admitting evidence admissible during a party's case in chief when offered in rebuttal. *Gies v. Boehm*, 78 Wyo. 449, 329 P.2d 807 (1958); *Hunt v. City of Laramie*, 26 Wyo. 160, 181 P. 137 (1919).

In this case, appellants had taken the deposition of witness Huntoon prior to trial. At that time they had the opportunity to determine the nature of his testimony, and they did so. Their argument that they were surprised by such testimony is not sustainable. The presence of seeps, bogs and surface water was testified to at length by appellants' witnesses in their case in chief. The exhibits were in the nature of cumulative evidence presented in rebuttal.

Of pertinence is the fact that the exhibits were presented on the last day of appellants' rebuttal, yet they were prepared and were available for presentation before appellants rested their case in chief. Additionally, the parties were earlier advised by the court concerning the offering of exhib-

its as a surprise to the other side. The following was said previously when appellants offered to introduce another exhibit not first made known to appellees:

"THE COURT: Before we have the objection, I am going to announce to you guys, exchange these exhibits. Even if it's an overlay, exchange them before we get into Court. We are getting the jury in and out and if you don't—

"MR. MEYER: I'm sorry—

"THE COURT: That is * * * all right. If you don't advise each other, I'm not going to admit them after today."

This court indicated its concern over the necessity for prior disclosure of contemplated evidence in *Barber v. State Highway Commission*, 80 Wyo. 340, 342 P.2d 723, 726–27 (1959).

"[I]f there be no trickery, material evidence should not be rejected merely because it is in improper order. However, under the Wyoming Rules of Civil Procedure, the bar and bench of this State are dedicated to a full and fair disclosure of all the facts in a case at or prior to the time of trial, with no withholding of certain matters to be used as secret weapons. It is our view that rebuttal testimony should ordinarily be limited to that which will relieve a litigant who, having been free from deception in the pleadings and pretrial stages, has at the trial been surprised and placed at an unfair disadvantage. To effectuate this, the trial court must have considerable latitude in demarcating rebuttal testimony."

The trial court was also aware of the potential for surrebuttal if the exhibits were allowed in evidence. Appellees would require time to examine any seeps near the well including those testified to by witness Huntoon to determine their cause—whether or not they resulted from rain, from another outside source, etc.

Under the circumstances of this case, it cannot be said that the trial court abused its discretion in allowing testimony concerning that reflected in the exhibits but denying the introduction into evidence of the exhibits themselves. The action did not

exceed the bounds of reason. The court could reasonably conclude as it did.

## ISSUE III—ALLOWANCE OF ADDITIONAL EXPERT WITNESSES

■ Appellants contend that the trial court erred in allowing an exception to its pretrial order by granting appellees Vanderbilt, Adobe and Grayrock an amendment to their list of witnesses to include expert witnesses Gene George, Don Cearly and Reginald Lee.[2] George's expertise was as a geologist, Cearly's expertise was as a "mud" expert, and Lee's expertise was as a geophysicist. Consolidated Oil and Gas had previously been denied a request to add George to its list of witnesses. The trial court expressed his reasoning in allowing the listing of the additional witnesses as follows:

"I did let those people in at a late hour and I appreciate the fact that that was late in the game, but I did that to be fair to these people because Cam Walker c[a]me into this case late and didn't have an opportunity to list experts at the time we were all talking about them early on in the case and I thought he deserved the opportunity—and he did—to list some experts of his own for your theory."

Following is the chronology pertinent to the court's reasoning.

March 3, 1987 *John Davis v. Consolidated Oil and Gas, Inc. and Loy E. Harris*[3] was filed. Docket 14978.

August 12, 1987 *Wayne Barnett, Fred Barnett, Clair Cheatham and Vida Cheatham v. Consolidated Oil and Gas, Inc., Loy E. Harris & Halliburton Company*[4] was filed. Docket 15092.

November 3, 1987 A scheduling order was issued requiring notification of witnesses by January 2, 1988.

November 12, 1987 *John Davis, Wayne Barnett, Fred Barnett, Clair Cheatham and Vida Cheatham v. Vanderbilt Resources Corp., Vanderbilt Energy Corp.,*[5] *Adobe Resources Corp., the Grayrock Corp. and Loy E. Harris* was filed. Docket 15153.

March 4, 1988 The three cases were consolidated.

May 5, 1988 Appearance was entered by Walker for Vanderbilt Corp., Adobe Resources Corp. and Grayrock Corp., previous counsel having had to withdraw because of a conflict of interest.

May 16, 1988 Walker, for his three clients, gave notice of supplemental witnesses George, Cearly, Lee and Lindley.

May 20, 1988 Appellants filed motion in limine to exclude testimony of the supplemental witnesses.

June 21, 1988 Trial commenced.

July 29, 1988 Verdict returned.

The court also ruled that it would allow appellants to list an additional rebuttal witness since appellees were allowed to list the four expert witnesses.

W.R.E. 103(a) provides in pertinent part: *"Effect of erroneous ruling.*—Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected."

The "substantial right" which appellants contended to have been affected by the court's ruling was a right to additional time in which to depose the newly listed experts and to react to the anticipated testimony. Appellants described such right in their affidavit in support of a motion to reconsider. Appellants stated they would suffer the following prejudices:

"1. Insufficient time in which to properly and adequately prepare to depose each expert;

"2. Insufficient time to actually depose each witness;

"3. No literature search or search relating to each witness' testimony can be accomplished in the time period allowed;

---

2. The amendment also included expert witness Lindley, but he did not testify.

3. The case against Harris was dismissed before trial.

4. Halliburton settled out of the case.

5. Vanderbilt Resources Corp. and Vanderbilt Energy Corp. merged in 1986.

"4. Typing of transcripts will take additional time and thereby allow insufficient time to prepare deposition summaries for purposes of impeachment;

"5. Insufficient time once the transcripts are received to permit Plaintiffs' experts to thoroughly review each prior to trial resulting in insufficient time for Plaintiffs to list the one (1) additional expert rebuttal witness the Court indicated it would permit;

"6. The additional work required of Plaintiffs' counsel because the Court allowed in Defendants' experts late in the game further prejudiced Plaintiffs' case by decreasing their time for trial preparation."

However, appellants took lengthy depositions of George, Lee and Cearly on June 10, 11 and 12, 1988. Thereafter, they did not avail themselves of the opportunity to list the authorized rebuttal witness. They did not ask for a continuance on the basis of that contained in the depositions—for the purpose of obtaining transcripts of the depositions to locate a rebuttal witness or to otherwise react to the information resulting from the depositions. The three witnesses were subject to extensive cross-examination at the trial.

The trial court did not abuse its discretion under the circumstances of this case. If it had refused the attorney who had recently made an appearance for Adobe Resources Corporation, Grayrock Corporation and Vanderbilt Corporation the ability to present his evidence, the potential for an abuse of discretion may have been greater than it would if the ruling was as here made.[6] The trial court's ruling did not exceed the bounds of reason. The court could reasonably conclude as it did. There was no abuse of discretion.

## ISSUE IV—DIRECTED VERDICT ON INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

On September 2, 1974, the United States Geological Survey sent a form to appellees containing conditions necessary for approval of a well abandonment, should an abandonment become necessary.[7] It required, among other things, the injection of concrete into the bottom of the hole sufficient to fill it above the Madison formation.

The well was plugged on September 25 and 26, 1974. One-hundred-fifty sacks of cement were injected into the Madison formation at the bottom of the hole. Normally, 75 sacks would be sufficient to fill the hole above the Madison formation. However, due to the cavernous nature of the formation at the well site, the 150 sacks of cement did not fill the hole above the Madison formation. "Heavy mud," a commonly used plugging material, was used to finish plugging the Madison formation.

The reports made by appellee Consolidated Oil and Gas, Inc., to the government were inaccurate in reporting the well plug to have been made as required. However, attached to the first report was a well history which accurately set forth the method in which the well was plugged. On August 13, 1979, the government approved the abandonment of the well.

Appellants, including appellant Davis, and their agents were inaccurately told by employees of appellee Consolidated Oil and Gas, Inc., in 1982, 1983 and 1984 that the well was plugged according to the government directions. Appellants argue that such misrepresentations caused appellant Davis to suffer emotional distress and mental anguish. They argue that "because of the salt on the ranch and the failure of his crops," Davis took many medications, had a portion of his stomach removed and became chronically depressed. This was the basis of appellants' claim for relief for intentional infliction of emotional distress.

▬▬ Appellants correctly note the standard upon which we review an appeal of a directed verdict, and they correctly note the fact that the tort of intentional

---

6. Adherence to a pretrial order is a matter within the discretion of the trial court. *Oukrop v. Wasserburger,* 755 P.2d 233 (Wyo.1988).

7. Such is the usual procedure when a well is being drilled on land leased from the federal government.

infliction of emotional distress is recognized in Wyoming:

"In reviewing the district court's decision to grant a directed verdict for appellee (defendant) at the close of appellant's (plaintiff's) case in chief, we will consider all of the evidence favorable to the party against whom the motion is directed (appellant) together with all reasonable and legitimate inferences which may be drawn therefrom. *Carey v. Jackson,* [603 P.2d 868 (Wyo.1979)]; *Town of Jackson v. Shaw,* Wyo., 569 P.2d 1246 (1977). When determining the question of sufficiency of the evidence on a motion for a directed verdict, we must, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, determine whether there can be but one conclusion as to the verdict that reasonable jurors could have reached. *Carey v. Jackson,* supra; *Town of Jackson v. Shaw,* supra; *Barnes v. Fernandez,* Wyo., 526 P.2d 983 (1974). Credibility of the witnesses and the weight given their testimony are for the jury to determine. *Kahler v. Martin,* Wyo., 570 P.2d 720 (1977); *Cimoli v. Greyhound Corp.,* Wyo., 372 P.2d 170 (1962). Whether or not appellant's evidence, viewed in the light most favorable to her, is sufficient to create an issue for the jury to consider is solely a question of law to be answered by the trial court. *Town of Jackson v. Shaw,* supra."

*Vassos v. Roussalis,* 658 P.2d 1284, 1286–87 (Wyo.1983).

 Appellants referred to *Leithead v. American Colloid Co.,* 721 P.2d 1059 (Wyo.1986) to note that the tort of intentional infliction of emotional distress was a valid cause of action in Wyoming. In that case, we commented on and quoted in part as follows from Restatement (Second) of Torts, § 46 (1965):

"Outrageous Conduct Causing Severe Emotional Distress

" '(1) One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for

such emotional distress, and if bodily harm to the other results from it, for such bodily harm.'

"Outrageous conduct is defined in comment 'd' of the Restatement as conduct which goes beyond all possible bounds of decency, is regarded as atrocious, and is utterly intolerable in a civilized community. Severe emotional distress is defined in comment 'j' as distress which is so severe that no reasonable man could be expected to endure it.

" * * * Comment 'h' to § 46 of the Restatement, Second, Torts, (1965) states:

" '*Court and jury.* It is for the court to determine, in the first instance, whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery, or whether it is necessarily so. Where reasonable men may differ, it is for the jury, subject to the control of the court, to determine whether, in the particular case, the conduct has been sufficiently extreme and outrageous to result in liability.'

" * * * Comment 'j' of § 46 of the Restatement, Second, Torts states:

" '*Severe emotional distress.* The rule stated in this Section applies only where the emotional distress has in fact resulted, and when it is severe. * * *

" 'It is for the court to determine whether on the evidence severe emotional distress can be found; it is for the jury to determine whether, on the evidence, it has in fact existed.' "

*Leithead,* 721 P.2d at 1065–67.

Without considering whether or not the necessary element of "outrageousness" for the tort claim is here present, conclusive in this instance that the directed verdict was proper is the lack of causation. The basic element for the tort is "causing" emotional distress. If appellees' statements did not "cause" the distress, there could not be

grounds upon which to found the tort claim.

The manner in which the well was actually plugged was known to appellant Davis and his attorney since 1982 when they were supplied with a copy of the well history. As noted supra, appellants acknowledge in their argument that appellant Davis' distress was "because of the salt on the ranch and the failure of his crops." A reasonable jury could not conclude other than whatever emotional distress suffered by appellant Davis was caused by the condition of his lands and its effect on his crops and not by any statements, true or untrue, made to him concerning the well. The directed verdict on the issue was proper.

### ISSUE V—DIRECTED VERDICT ON FRAUD

■■ Appellants again refer to the inaccurate statements made in 1982, 1983 and 1984 by employees of appellee Consolidated Oil and Gas, Inc., to appellants and their agents that the well was plugged according to the government directions as the basis for their claim of fraud.

To constitute fraud, there must be a false or fraudulent statement or misrepresentation or concealment of a material fact, made by the defendant to induce action or inaction, which was reasonably and justifiably believed to be true by the plaintiff, and relied upon by the plaintiff to his damage. *Johnson v. Soulis*, 542 P.2d 867 (Wyo.1975) and *Davis v. Schiess*, 417 P.2d 19 (Wyo.1966).

The standard set forth supra upon which we review an appeal of a directed verdict is here applicable. A reasonable jury could not find all of the elements of fraud in this case.

The following reflect that appellants could not "reasonably and justifiably believe the statements were true," and that appellants "relied upon" such statements. The manner in which the well was actually plugged was known to appellant Davis and his attorney since 1982 when they received a copy of the well history. Appellant Davis employed Geomax, a geological firm, to determine the cause of the groundwater.

It reported in May of 1983 that the groundwater came from other than the well. At Davis' request, the Bureau of Land Management investigated the condition of the Davis ranch. It concluded:

*"Conclusions:*

"Based on analyses within this report, the following conclusions regarding the Davis Ranch seepage problem are forwarded:

"1. The seepage problem on Mr. Davis' property appears to be the result of a complex combination of two groundwater systems merging within the problem area. One system is comprised of waters associated with the Shell Creek floodplain and alluvium. The other system is associated with one or both of the following: 1) a discrete groundwater discharge point which is part of a larger geological system discernable throughout the area, or 2) subterranean movement down the Porter Gulch alluvium which is merging with and is being diluted by Shell Creek floodplain water.

"2. Chemical analyses of the problem-causing seeps and water within the Davis drain do not conform to expected Madison water characteristics in this area. The Madison should produce a very fresh calcium bicarbonate or calcium sulfate type water. Water observed within the Davis Ranch problem area is very saline sodium sulfate water. This water is more typical of discharges from shale areas which overlie most of the area north of the Davis Ranch.

"3. Based on conclusions 1 and 2, it is highly unlikely that the Davis problem is related to leakage from Consolidated Oil and Gas Well No. 2. The problem is more likely a manifestation of a long occurring natural groundwater discharge area."

On May 25, 1982, in response to appellant Davis' inquiry, the potential that the well plugs did not hold was made known to

appellant Davis by Professor Heasler, Geology Department, University of Wyoming.

Not only did appellants not "reasonably and justifiably" believe the statements to be true, they "disbelieved" them. The investigative activities of appellants belie any reliance on the statements or the existence of any belief in their truth.

The directed verdict on this issue was proper.

Finding no error, we affirm as to all parties except appellee Consolidated Oil and Gas, Inc., action as to it being for the bankruptcy court and not for this court.

URBIGKIT, J., files a dissenting opinion.

URBIGKIT, Chief Justice, dissenting.

In this case, the majority makes an assumption of procedural fact and redefines the English language to sustain a jury verdict in the face of an erroneous special verdict form which submitted a case to the jury for decision that had not been presented as the issues of the litigation. Agreeing to do neither, I dissent.

I agree with appellants in their contention that allowable discretion of the trial court in procedural decisions was exceeded in late granted authorization to appellees for additional expert witnesses and in denied rebuttal evidence presented for use by appellants. However, in these other regards except to state disagreement with the trial court's decision, the subjects will not be extensively pursued since reoccurrence in future cases should not be expected.

The principal problem of this case is submission for jury decision of a factually erroneous and substantively conflicting special jury verdict form. In actual result, if we apply the often but usually overstated declination that it is presumed the jury will follow the court's instructions, *Goggins v. Harwood,* 704 P.2d 1282 (Wyo. 1985); *State Highway Commission v. Peters,* 416 P.2d 390 (Wyo.1966), the instruction actually given in this case constituted a directed verdict for appellees. The preclusive decision occurred in the phraseology of the verdict for the issue then remaining after other claims had been rejected by the trial court's preemptory partial directed verdict.

The facts of this case, relating to the terminology used in the dysfunctional form of the jury verdict, require some recitation for proper analysis of the preclusive error. Appellants in this case are several second or third generation homesteader ranchers in an irrigated farming area of the Big Horn basin first settled about 1892. The area was the Shell Creek Valley in the north central part of Wyoming. The families in the area over the many years of farming and ranching raised small grains, beets, hay and cattle.

In 1974, appellees came to the valley to drill an exploratory oil well on a federal oil and gas lease in Herren Gulch which was located about a mile from the farming land of the appellants. The test well was reasonably shallow, about 2,700 feet to the Ten Sleep formation. The record, however, reasonably demonstrates that the test continued 200 feet deeper and entered the Madison formation where high bottom hole pressure was then encountered which blew the drilling mud out of the well. Ultimately, the test was unsuccessful and the well was plugged and abandoned.

The six week trial tested and contested what was done or not done in plugging and abandoning the unsuccessful saline water pressured Madison formation well. In oil patch parlance, this could have been called a "duster," but in fact it was a high pressure salt water non-oil producer.

Appellee Consolidated Oil & Gas, Inc., as the driller and principal in the wildcat effort, received specific instructions for plugging and abandoning the well from the United States Geological Service. It does not appear to be questioned that the instructions were not actually followed and that a false affidavit of plugging was filed by Consolidated Oil & Gas, Inc. with the governmental agency. Consolidated Oil & Gas, Inc. continued to pretend by supplying the same false and misleading plugging information for about ten years thereafter and even after questions subsequently de-

veloped about the well's involvement in subsurface water problems which came to develop under the appellants' property. This much is clear from the record. Nearly everything thereafter is in controversy except for another trial time development of catastrophic significance to the appellants arising from the form of jury verdict used.

About four years after the abandonment of the well, appellants started to observe changes in their ranch and farmlands and the desert areas near the well. Subsurface water problems began to develop, progressively destroying the productivity of the agricultural lands. Alkaline seeps developed and general alkaline subsurface water raised the underground water table.

The resulting theory of litigation that followed is succinctly outlined in one of appellants' briefs:

1. The Appellees drilled an exploratory well which penetrated the high pressure Madison formation (this was admitted by the Appellees);

2. The Appellees intentionally failed to seal off the Madison Formation in accordance with the approved plan for doing so (this was admitted by Appellees);

3. The approved plugging plan would have resulted in a cement plug ending more than 100 feet into the formation above the Madison Formation (this was admitted by Appellees);

4. The actual plugging by Appellees left a cement bottom plug which was 23 feet below the top of the Madison Formation (this was admitted by Appellees);

5. After this took place, the subsurface water table in the valley floor below the well was increased by 16%, and the Appellants suffered water damage to their ranches.

Without being able to specify the specific median of intrusion by which the Madison waters were affecting the upward movement of water from the 2,845 foot elevation, or exactly how the underground extrusion of pressure occurred, appellants argued that the down hole Madison pressure was intruding into the subsurface water level and forcing the water up underneath

the soil to saturate and alkalize the lands from underneath the surface by a raised water table of contaminated water.

The case from this point became a battle of forensic experts with defenses directed to analysis that the plugging was adequate, even if improper, and that the resulting killing of the farmland by subsurface water could not be properly attributed to the Madison formation plugging in the abandoned well whether leaky or not. This scenario within the six week trial provided the eternal quandary between cause and effect and sheer happenstance for application of logical reasoning. An overabundance of experts provided fodder for jury cogitation with one group concluding that the Madison formation pressure released upwards was raising the water table, while the others responsively discerned that it could not possibly be so.

Those contested issues, despite the unquestioned circumstance that the plugging was not done in accordance with United States Geological Service instructions and that a false affidavit had been filed, now come here on appeal on a verdict which, *on its own surface*, was improper. These were subsurface events and not surface flow controversies. The jury verdict form asked a question not involved in the litigative controversy and did not ask the question actually presented.

The jury was given a special verdict form with included instruction that if the first question was answered "no," the jury need not go further. That part of the special verdict form stated:

We, the jury, present the following answers to the questions submitted by the Court:

1. Have plaintiffs proven by a preponderance of the evidence that ineffective plugging and abandonment of the Herren Gulch #2 well caused Madison water to flow *on to* any of their ranches?

Yes ___ No X

If your answer to this question is "no" do not answer any other questions, have the foreperson sign the verdict form and notify the bailiffs. If your answer to

this question is "yes" answer question number 2.

2. Did the defendant Consolidated Oil & Gas, Inc., commit a subsurface trespass *onto or under* the land of the following plaintiffs?

| | | |
|---|---|---|
| John Davis | Yes ___ | No ___ |
| Wayne Barnett | Yes ___ | No ___ |
| Fred Barnett | Yes ___ | No ___ |
| Clair Cheatham and Vida Cheatham | Yes ___ | No ___ |

(Emphasis added.)

The problem in the instruction is illuminated by the difference in terminology found in questions one and two:

Question 1: "flow on to"

Question 2: "commit a subsurface trespass onto or under."

The entire theory of appellants' case was upward subsurface pressure which raised the saltine contaminated water level. This case and its six week trial had absolutely nothing to do with Madison water flowing "on to" appellants' ranches. This was not a surface flow case. The majority now recreates a case that did not then exist by redefining "on to" to include concepts of upward pressurized migration of water into zones at the closer surface elevation. If this is not so, why was the second interrogatory, which the jury was not permitted to answer and which more appropriately stated the case, not presented? [1]

I believe the English language, physics, and even common knowledge require recognition of the clearly erroneous nature of the verdict form given. Since the case did not factually involve trespass upon the surface, the instruction closed out the case with what was essentially a directed verdict by special verdict form and limited review to a subject which had not occupied the trial evidence. *Cf. Gilliland v. Rhoads*, 539 P.2d 1221 (Wyo.1975) and *Gillaspie v. Duncan*, 410 P.2d 577 (Wyo.1966).

The more difficult question requires analysis of the record to determine if appellants committed a waiver sufficient to absolve the error resulting from the disposi-

tively wrong and derogatory instruction. *Goggins*, 704 P.2d 1282. This court takes refuge in characterizations of "sandbagging" and "invit[ed] error" attributable to losing counsel when the jury has been improperly instructed. This record, within my observation, totally fails to support that sloganistic justification for affirming this appeal. Furthermore, I cannot accept the harmless error constituency within the language of the instruction by attribution to the words of what they do not say and then by definition to mean fairly what they do not mean; and, consequently, removing from jury consideration the defined issue at controversy in the trial—that appellants seek damage for the improper plugging of an abandoned oil well which raised the subsurface level of contaminated waters.

The lack of any justification for the unsupported usage of condemnatory terms, such as sandbagging and invited error, cannot be settled by attribution of waiver or failure to object. What was obviously not properly perceived by counsel or the trial court, was that a bad verdict form was proposed by appellees and was then given. *Wyoming Coal Mining Co. v. Stanko*, 22 Wyo. 110, 135 P. 1090 (1913). W.R.C.P. 49 involves the correlative duty of all counsel to assist the court to avoid mistakes or, conversely, to document the record by objection when a faulty instruction for improper verdict is tendered for jury resolution. *Goggins*, 704 P.2d 1282. See generally W.R.C.P. 51 (according the same responsibility for verdict form as exists for instructions); and Note, *Special Verdicts and Interrogatories to Jury*, 12 Wyo.L.J. 280 (1958). The spirit of the rule is the issue at task. *Oeland v. Neuman Transit Co.*, 367 P.2d 967 (Wyo.1962).

In briefing, appellees announce that no objection was made and now this majority adopts that construction of the record. Appellants state to the contrary that objection was made. Consequently, we do not even have congruity within this subject to properly address what would involve harmless

---

**1.** "Onto" and "on to" may have different linguistic attributes, but "onto" is defined as: "to a position on." Webster's Ninth New Collegiate Dictionary 825 (1986). The word clearly means supported by and not underneath and pressured upward towards the surface.

error resulting from a misphrased instruction or plain error to which no objection was taken. When all else fails, we could look at the record to see what it reveals compared to what the litigants and the majority have recited in an undocumented conclusion. In this regard and consequent necessity for reversal, this case is comparable to *Edwards v. Harris*, 397 P.2d 87 (Wyo.1964).

It is first found that three special verdict forms were submitted by appellants which generally, except for deletion of the last paragraph and the changes in the form of the first paragraph, are identical with the instruction used:

We, the jury, present the following answers to the questions submitted by the Court:

1. Did the Herren Gulch #2 well leak water unto or under the property of the following plaintiffs?

| | | |
|---|---|---|
| John Davis | Yes ___ | No ___ |
| Wayne Barnett | Yes ___ | No ___ |
| Fred Barnett | Yes ___ | No ___ |
| Clair and Vida Cheatham | Yes ___ | No ___ |

If your answer is yes to any of the plaintiffs, go on to question 2 for those plaintiffs. If your answer is no to any of the plaintiffs, do not answer the rest of the questions with respect to those plaintiffs.

2. Did the defendant Consolidated Oil & Gas, Inc., commit a subsurface trespass onto or under the land of the following plaintiffs?

| | | |
|---|---|---|
| John Davis | Yes ___ | No ___ |
| Wayne Barnett | Yes ___ | No ___ |
| Fred Barnett | Yes ___ | No ___ |
| Clair Cheatham and Vida Cheatham | Yes ___ | No ___ |

The quandary that remains is why the term of the first question on the verdict form as submitted by appellants was changed only as to the subject here presented on review? (The deletion of the last clause of the proposed instruction is not presently in contention.) The record reveals that the verdict form was created by someone taking the first paragraph from a form submitted by Adobe Resources Corporation (one of the appellees) and then copying, in almost exact or identical form, all succeeding paragraphs from the three requested forms submitted by appellants except for the last deleted paragraph.

The record, without assistance of any transcript of the instruction conference which apparently occurred the day before the jury was instructed, does not add knowledge to assess why the trial court rejected the appellants' portion of the instruction in the critical first paragraph and, instead, adopted the submission of the appellees by attachment to the general form supplied by appellants. Small words can make a world of difference. The change in phraseology was to delete the "onto or under" language found in appellants' submission and replace it with the "on to" transformation provided by appellees.

Lacking a transcript of the discussion from which the transformation was derived, we are left with a brief colloquy in open court when it was time for stating objections for any information in the record about the occurrence. After stating a number of objections to instructions given or rejected at the prior unrecorded conference, counsel for appellants stated:

And then I've got three proposed verdict forms which I have presented to the Court and plaintiffs. Verdict number one, special verdict number two and verdict form number three.

The Court: One, two and three?

Mr. Williams: That's correct, but I should wait until the Court reviews its verdict form before I make a record on that.

The Court: Cam?

Mr. Walker: Go ahead. We will join in defendant Consolidated's offers.

Mr. Weiss: At this point defendant Consolidated and the others would also object to not—the Court not instructing or including in the instructions given on the fraud and estoppel as a bar to the statute of limitations—

The Court: You have to give me a—

Mr. Weiss: What we proposed as Instruction lettered A, to keep them clear, either a separate instruction or should

have been included in it concerning the effect of an independent investigation on the plaintiff to rely upon any misrepresentation of fraud.

Defendant Consolidated would also object to the Court's failure to instruct what we have tendered as Instruction B, concerning speculation on facts as well as the one that was given concerning speculation on damages.

The Court: Okay, Cam?

Mr. Walker: I join in those offers and I also offer special verdict which I will mark at the top Adobe.

The Court: One.

Mr. Walker: One special verdict form.

Mr. Williams: Let me give you that special verdict form and I will make my record.

Mr. Weiss: Could I put in one thing? Defendant Consolidated would join in Mr. Walker's objection concerning the special verdict form.

Mr. Williams: Attached to my plaintiffs' offered jury instructions are three proposed plaintiffs' verdict forms which I understand the Court rejected. I believe there should be a question and answer regarding the agency of Consolidated— rather the agency—whether or not an agency relationship exists between Vanderbilt Resources, that is the Adobe entities, as a principal and Consolidated Oil and Gas as an agent.

I also object to the failure of the Court to give Plaintiff's [sic] Instruction No. 6 dealing with committing a subsurface trespass and I cite the Restatement of Torts, 158 and 159, which is right on point which says we are entitled to this instruction. I tender these instructions.

The Court: These are the ones you object to, Counsel?

Mr. Williams: These are ones you refused.

Appellees only addressed the verdict as quoted by tendering the special form for which the first paragraph was substituted for the first section tendered by appellants to create the instruction which was given. So ended the colloquy for the open trial objections to the form of the jury verdict.

We are placed in review with decision of error as possibly harmless when objection is taken or plain error when the proper objection is not made. Obviously, objection to the instruction was made and a proper instruction on the subject involved had been tendered. Nothing within the entire scope of the tendered record reveals why the phraseology of the Adobe Resources Corporation document was used for paragraph one and the totally different appellants' form used for paragraph two when the subjects addressed were identical in factual significance. To be compared in the dispositive language is *Texas Gulf Sulphur Co. v. Robles*, 511 P.2d 963 (Wyo. 1973), where the appellant neglected to supply a properly worded instruction. *See also Haley v. Dreesen*, 532 P.2d 399 (Wyo. 1975).

I perceive that adequate objection was taken and it was not harmless. I further find that under the confining circumstances of the six week trial, plain error otherwise appeared when a subsurface bad water intrusion case was converted into a surface flow problem for decision. By no means can I accept any contention that "onto" means under in one paragraph, but requires "under" in the next paragraph to properly define the nature of the case as one of subsurface occurrence.[2] The elastic boundaries we have created by W.R.A.P. 7.04, harmless error and W.R.A.P. 7.05,

---

**2.** It is my conclusion, not only from a diligent review of the record but also questions addressed at oral argument and statements found in brief, that no one really knew or necessarily recognized the transformation that occurred through whatever process. Adobe Resources Corporation must have known what they meant and not intended to do any favor, but why the incorrect terminology was accepted to be added to the verdict form is just untold in this record. Strangely enough through briefing and into oral argument, the contentions and arguments which are now followed by the majority fail to recognize the chasm separating the text and tenor of the first instruction from what the question would have been if the jury had ever moved further to the second decision. Anyone in irrigated farming communities knows the singular difference between subsurface moisture rising from below and excess accumulation of surface water running from higher elevations *on to* the land.

plain error, cannot be extended to an empirically misinstructed jury decision. This is not a *Goggins* case. Fundamental error exists where the case tried is not the case for which the verdict form is provided or the decision is rendered. *Twing v. Schott,* 80 Wyo. 100, 338 P.2d 839 (1959); *McNamara v. O'Brien,* 2 Wyo. 447 (1881). If not accommodated with a harmful error review, this misadventure in verdict terminology constitutes plain error. *Hays v. State,* 522 P.2d 1004 (Wyo.1974).

Addressing another subject, in a long and severely contested trial such as this one, it is understandable why the appellate court accords discretion to the trial court in normalized decision as here found in a late date permission to appellees to add additional expert witnesses and the rejection of rebuttal evidence tendered by appellants. Having said it is understandable, I am not persuaded that it did not constitute an abuse of discretion. *Martin v. State,* 720 P.2d 894 (Wyo.1986). Many courts have opined about criminal defendants' use of changing attorneys to obtain delay in proceedings. Here a change in attorneys afforded a basis to correct a glaring omission in pretrial preparation by present appellees. I might more easily accept that result as fair if an adequate opportunity to recover had been realistically available to the innocent party. Lacking that time within the status where, by changing attorneys, a litigant sought to add additional expert witnesses at the last moment, I perceive that organized process as fairly applied would have required denial. This is the exact converse and the opposite result of what happened in *Kobos By and Through Kobos v. Everts,* 768 P.2d 534 (Wyo.1989). *See Shields v. Carnahan,* 744 P.2d 1115 (Wyo. 1987).

I also fail to find any proper basis for rejection of the rebuttal video tape which was put together while the trial was in progress and consequently could not have been subjected chronologically or factually to an earlier tender, since the proposed exhibit would have shown what was different from what appellees said it was to have been, clear and proper office for rebuttal evidence was constructed. *State v. Alex-*

*ander,* 78 Wyo. 324, 324 P.2d 831 (1958), *cert. denied* 363 U.S. 850, 80 S.Ct. 1630, 4 L.Ed.2d 1733 (1960); *New Hampshire Fire Ins. Co. of Manchester v. Boler,* 55 Wyo. 530, 102 P.2d 39 (1940).

I would have reversed for retrial and, consequently, dissent.